## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 22-cv-3293-WJM-NRN

KAORI KEYSER,

      Plaintiff,

v.

TERRACON CONSULTANTS, INC.,

      Defendant.

---

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This matter comes before the Court on Defendant Terracon Consultant Inc.'s ("Terracon") Motion for Summary Judgment ("Motion") (ECF No. 43) as to Plaintiff Kaori Keyser's ("Plaintiff" or "Keyser") remaining claims arising under the Americans with Disabilities Act ("ADA") and Colorado Antidiscrimination Act ("CADA").[1] Keyser filed a response (ECF No. 45), and Terracon filed a reply (ECF No. 57). For the reasons set forth below, the Motion is granted.

### I.     BACKGROUND[2]

Terracon is a self-described "employee-owned consulting engineering firm

---

[1] Terracon originally also sought summary judgment on Keyser's claims for unpaid overtime under the Colorado Wage Claim Act (Claim Five) and Fair Labor Standards Act (Claim Six). (*See generally* ECF No. 3; ECF No. 43 at 27–30.) Keyser has since voluntarily dismissed those claims, so the Court disregards that portion of Terracon's Motion pertaining to Claims Five and Six as moot. (ECF Nos. 45, 61.).

[2] The following factual summary is based on the parties' briefs on the Motions and documents submitted in support thereof. The facts set forth herein are undisputed unless attributed to a party or source. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

specializing in environmental, facilities, geotechnical, and materials services." (ECF No. 43 at 2.) In March 2021, Terracon hired Keyser to work in its Fort Collins, Colorado office as a Field Environmental Engineer—an entry-level position for individuals who hold at least a Bachelor of Science ("B.S.") in environmental engineering, civil engineering, or a related field, but may otherwise be new to the industry. (*Id.* at 5 ¶¶ 4-6.) Among other credentials, Keyser had earned her B.S. in Environmental Engineering from Colorado State University in August 2020 (ECF No. 43-1), in furtherance of which she took "specialized courses." (ECF No. 43 at 4-5 ¶ 2.) According to Terracon, it hired Keyser for the position "based on her specialized training and experience." (*Id.* at 5 ¶ 5.)

However, as further detailed below, Terracon terminated Keyser's employment less than a year later for two alleged instances of "timesheet fraud." In this action, Keyser asserts, among other things, that Terracon's assertion of timesheet fraud is merely a pretextual justification for Terracon's terminating her employment due to her disability.

## A.   Terracon's Time Keeping Policies

Throughout Keyser's employment with Terracon, Terracon required its employees to track their "chargeable" time spent on client projects via weekly timesheets to facilitate the preparation of invoices, among other reasons. (*Id.* at 7 ¶¶ 13, 18.) Employees were also required to record their time spent on "non-chargeable" tasks—*i.e.,* "work time" unrelated to a specific project and which could not be charged to a client, such as reviewing emails, cleaning equipment, preparing field sheets for general use, and discussing non-project related questions with personnel. (*Id.* at 8 ¶

2

19.)  At least one purpose of tracking non-chargeable time was that it enabled Terracon to monitor whether employees were meeting their "chargeability goals"—*i.e.,* their individual targets for the percentage of chargeable work time versus non-chargeable time per week.  (*Id.* at 8 ¶ 20.)

Throughout her employment with Terracon, Keyser's weekly chargeability goal was 80%.  (*Id.* at 8 ¶ 21.)  Her direct supervisor, Michael Skridulis, reviewed her timesheets on a regular basis.  (*Id.* at 6 ¶ 11–12.)  According to Terracon, Skridulis routinely spoke with his direct reports regarding their chargeability goals, specifically addressing any instance where they were below their chargeability goals in a given week and had otherwise provided insufficient explanations for any non-chargeable time reflected on their timesheet.  (*Id.* at 8 ¶ 22.)

Terracon also had a written policy concerning "Timesheet, Expense, and Invoicing Integrity," contained within its Principles of Business Conduct and Ethics Policy ("Ethics Policy"), which stated:

> We have a duty to Terracon and our clients to report our time . . . accurately on our timesheets and accurately invoice our clients . . . .  It is imperative that all employee timesheets, . . . and invoices be prepared in an accurate, honest, and ethical manner.  That includes recording all hours worked, recording of the correct days and projects, . . . and recording time on the correct project.  Failure to accurately report timesheet data . . . misstates the actual performance of personnel and projects.  It also affects the accuracy of long term analysis of project timelines which Terracon uses to determine future business strategies. Inaccurate or improper . . . invoicing calls our business ethics and credibility into question and creates disharmony and distrust with our clients.  In addition, timesheet, . . . and invoicing inaccuracies can create a liability for Terracon, such as fee disputes, project litigation, or possible allegations of criminal fraud.

3

(ECF No. 43-7 at 1.)[3]

Employee timesheets—or at a minimum, Keyser's timesheets—included a reminder regarding the Ethics Policy. (*See, e.g.,* ECF No. 53-7 at 2 ("It is imperative that all employee timesheets be prepared in an accurate, honest, and ethical manner. That includes recording all hours worked, recording of correct days and projects.").) Keyser's timesheets also included contact information for "Project and Accounting Application Support" through the "Terracon Helpdesk." (*Id.*)

**B.    First Instance of Alleged Timesheet Fraud**

Keyser's job duties at Terracon included, among other things, conducting site investigations. (ECF No. 43 at 6 ¶ 8.) During these site investigations, Keyser was tasked with collecting soil and water samples, which she would then provide to Terracon's lab for testing. (*Id.* at 6 ¶ 9.) Keyser would in turn analyze the data generated by the lab to determine whether, for example, the samples exceeded certain regulatory limits and prepare a report for the client including her findings along with any recommendations for additional testing or remediation. (*Id.* at 6 ¶¶ 9-10.) Terracon asserts that, on average, Environmental Field Engineers complete reports in approximately 10 hours or less. (*Id.* at 9 ¶ 27.) However, Keyser disputes this, stating that she "spent anywhere from one hour to fifty-six hours on preparing a report for a client during her tenure" with Terracon, with 10 of the 23 reports she prepared during her employment with Terracon taking her more than 10 hours. (ECF No. 44 at 3 ¶ 27.)

---

[3] The version of the Ethics Policy appended to Terracon's Motion is dated 2019 and appears to have been in effect at all relevant times during Keyser's employment. (*See also* ECF No. 43 at 7-8 ¶¶ 14–17 (quoting Ethics Policy), *undisputed at* ECF No. 44 at 2 ¶¶ 14–17.)

In or around September 2021, Keyser performed such field work for Terracon client "VC," in connection with which she was required to prepare a report.  (*Id.* at 9 ¶ 25.)  Keyser charged roughly 32 hours to VC for time spent working on the report.  (*Id.* at 9 ¶ 26.)  According to Keyser, these 32 hours were charged over the span of approximately a month.  (ECF No. 44 at 3 ¶ 26.)  At some point after seeing the time Keyser had charged in connection with her work on the VC report, Skridulis approached her about the status of the report ("September 2021 Meeting").[4]  (ECF No. 43 at 9 ¶¶ 28–29.)

According to Terracon, "[w]hen [] Skridulis asked for the report, [Keyser] had nothing to show for it."  (*Id.* at 9 ¶ 28 (citing ECF No. 43-3 (Skridulis Dep.) at 31:21–24 ("[Keyser] had charged a lot of time to her timesheet working on that report [for] which she was able to produce any type of deliverable or evidence that she had actually completed anything pertaining to that report.")).)  Keyser does not dispute the report was incomplete as of the September 2021 Meeting (ECF No. 44 at 3 ¶ 30)[5] but asserts she told Skridulis "that she had been working on the report, but had not gotten as much done as she would have liked to have gotten done in the amount of time that she'd spent" (*id.* at ¶ 28).  She does not, however, claim she showed or sent Skridulis evidence of the progress she had made on the report up until that point.

---

[4] Keyser states she "does not recall" whether her conversation with Skridulis about the time she charged in relation to the VC report took place over the course of one meeting or two and whether the meeting(s) occurred via video call or otherwise.  (ECF No. 44 at 3 ¶¶ 29, 31.)  Such facts appear to be immaterial to the issues before the Court.  Thus, for simplicity, the Court will refer to these collective conversations—whether one or two and occurring via video call or not—as the "September 2021 Meeting."

[5] It appears that Keyser also did not complete the report at any point after the September 2021 Meeting.  (ECF No. 43-2 (Keyser Dep.) at 33:3-8 ("Q: Did you ever complete the report? / A: No.").)

During the September 2021 Meeting, Keyser "became visibly distraught and started crying," which Terracon asserts prompted Skridulis to ask her if she needed assistance with any non-work-related issues affecting her performance.  (ECF No. 43 at 10 ¶ 31.)  Keyser states she informed Skridulis at that time "that she was having difficulty focusing and was experiencing fatigue."  (ECF No. 44 at 3 ¶ 31.)  Ultimately, Skridulis directed her to employee support resources, including at least Terracon's Department of Human Resources ("HR").  (ECF No. 43 at 10 ¶ 32.)

Terracon asserts that Skridulis "found that [Keyser]'s actions constituted timesheet fraud, a terminable offense," despite that he had directed her to HR for additional support instead of terminating her at that time.  (*Id.* at 10 ¶ 33.)  Keyser disputes this characterization on the basis that there is "no record of [her] committing timecard fraud," no "indication of this 'terminable offense being investigated,'" and no indication of Keyser "being written up."  (ECF No. 44 at 10 ¶ 33 (citing ECF No. 44-3 at 134:1–12 ("Q: Did you perceive it as coaching when someone says, Why is there so much time billed to this and there's no actual report? / A: No.")).)

Apart from reporting that "she was struggling to keep up with work and having trouble concentrating" (ECF No. 44 at 4 ¶ 10), Keyser did not inform Skridulis of any claimed disability during the September 2021 Meeting.  (ECF No. 43 at 10 ¶ 34.) [6]

## C.    Keyser's Request for a Reduced Schedule

On September 22, 2021, around the same time as the September 2021 Meeting,

---

[6] While Keyser asserts that "Skridulis had been informed on previous occasions of [her] disability," the evidence to which Keyser directs the Court does not support this assertion.  (*Id.* (citing ECF No. 44-3 (Keyser Dep.) at 40:1-8 ("Q: Did you talk to [Skridulis] about personal matters frequently? / A: Somewhat. / . . . / Q: Did you ever tell him you were diagnosed with depression? / A: Not specifically.")).)

Keyser was seen by a medical provider for the "Chief Complaint" of

"ADHD/Depression/PTSD."  (ECF No. 44-12 at 1.)  During that visit, the provider noted

Keyser's symptoms included "difficult to maintain attention or complete tasks" and that

she was "experienc[ing] poor concentration, fatigue, low mood, low self-esteem, lack of

interest, and low appetite."  (*Id.* at 3.)  She was diagnosed with "F31.9 Bipolar disorder,

unspecified."  (*Id.*)

The next day, Keyser reached out to an HR Coordinator at Terracon, stating in

an email:

> I've been going through a bit of a depressive episode and
> have has [*sic*] some trouble getting things done in work and
> at home.  I started seeing a new therapist this week, but
> wanted to find a time to chat with an HR person to see what
> kind of accommodations might be appropriate and available
> to help me get my work done well and on time.

(ECF No. 44-11 at 1.)  In the following days, Keyser spoke with HR regarding options

available to her, including short-term disability leave ("STD").  (ECF No. 43 at 10 ¶ 35;

*see also* ECF No. 44-11 at 3; ECF No. 43-8 at 17.)  On September 30, 2021, Keyser

formally requested an accommodation of a temporarily reduced schedule and use of

short-term disability, which Terracon's third-party provider subsequently granted.  (ECF

No. 43-10 ("I spoke to my provider yesterday and I'd like to move forward with what we

talked about regarding reduced hours and short-term disability.  Please let me know

what next steps I need to take are.").)  Keyser informed Skridulis she was going on

"intermittent STD" on October 1, 2021.  (ECF No. 44-5 at 5.)  However, Terracon asserts

that neither Skridulis nor his supervisor, John Graves, knew Keyser's reason for

requesting a reduced schedule, nor did they know of her disability.  (ECF No. 43 at 11 at

7

¶ 40.)  Keyser disputes this at least insofar as Skridulis knew she sought assistance in the form of short-term *disability* leave.  (ECF No. 44 at 4 ¶ 40.)

In accordance with her request, Keyser worked a reduced schedule from October 1, 2021 to November 1, 2021.  (ECF No. 43 at 11 ¶ 37.)  During that time, Terracon "assigned [her] duties that would help accommodate her reduced schedule." (*Id.* at 11 ¶ 38.)  In October 2021, Keyser also began working with the Colorado Division of Vocational Rehabilitation ("DVR"), a state agency that provides employment-related services to individuals with disabilities.  (ECF No. 44-10 at 3; ECF No. 44 at 8 ¶ 60.) Keyser states she specifically sought resources from the DVR to help her better focus and organize her tasks at work.  (ECF No. 44 at 8 ¶ 61.)

## D.    Alleged Second Instance of Timesheet Fraud and Termination

Keyser resumed her full-time schedule in November 2021, and Terracon reintroduced her to the type of work she had been completing prior to her short-term disability leave.  (ECF No. 43 at 11 ¶ 39.)  Nonetheless, Keyser asserts she was not given full-time work each week and had a significant number of general administrative hours throughout late November and continuing until her termination.  (ECF No. 44 at 4 ¶ 41; *see also id.* at 7 ¶ 58 ("After Plaintiff returned to work, she was not given a full-time workload most weeks from November 1, 2021 until her termination in January 2022, despite asking for more work.").)

In January 2022, during a routine review of his direct subordinates' timesheets, Skridulis observed that Keyser charged 10.50 hours of non-chargeable time to Terracon's general administration number during the week of January 9, 2022.  (ECF No. 43 at 12 ¶ 42; *see also* ECF No. 43-8 at 18.)  Terracon asserts that general

8

administrative time is "supposed to be used for work activities that benefit the company,

such as training, reviewing emails, cleaning equipment, preparing field sheets for general

use, and discussing non-project related questions with personnel." (ECF No. 43 at 13 ¶

51; *see also* ECF No. 43-3 at 39:19-25; 40:1-3.) Thus, Skridulis thought 10.5 hours was

"an excessive amount of time billed to the general code given that the Environmental

Department had a significant amount of chargeable work available at the time."[7] (ECF

No. 43 at 12 ¶ 43.)

On January 18, 2022, Skridulis and Keyser had the following e-mail exchange

regarding the general administrative time she charged during the week of January 9:

> [Skridulis]: [C]an you please send me brief explanation [*sic*]
> of the 10.50 hours of general time for last week? We are
> way under your chargeability budget and that is a lot of time
> to the 0200 number. I know we have more work than we
> can currently perform so I need help understanding why that
> time cannot be spent on project work. Thanks.

> [Keyser]: I should have talked to you about this, but it feels
> kind of embarrassing . . . . I've been working with the
> division of vocational rehabilitation to try to come up with
> ways to manage the ways my disability can make my work
> performance and consistency hard to keep up with. With
> being the only field employee right now, I kind of freaked out
> and needed some resources and guidance on how to get on
> top of things and stay on top of them. Things should be
> better moving forward.

(ECF No. 43-7.)

There is some dispute—if not confusion—as to what Keyser meant in stating that

---

[7] Keyser repeatedly disputes the characterization that 10.50 hours was an "excessive" amount
of GA time because she had recorded "significant amounts" of GA time on prior occasions
without consequence. (*See, e.g.,* ECF No. 44 at 2 ¶ 22; *id.* at 5 ¶ 43.)

she had "been working with the [DVR]" in her email response. [8]  In any case, Skridulis

understood her e-mail response at the time to mean that "some or all of the 10.50 hours

were spent with the DVR."  (ECF No. 43 at 12 ¶ 45.)  Terracon ostensibly did not

consider this to be appropriate general administrative time, and Keyser had not

otherwise obtained prior approval to charge her time spent working with the DVR to that

code.  (*Id.* at 13 ¶ 50.)  Terracon asserts it thus regarded Keyser's recording of GA time

for receiving DVR services to be a "dishonest and fraudulent charge."  (*Id.* at 13 ¶ 52.)  In

Terracon's view, this was Keyser's "second instance of timesheet fraud," and since

"Skridulis had already spoken to [Keyser] just a few months prior regarding timesheet

integrity," it decided to terminate her employment on January 24, 2022.  (*Id.* at 13 ¶ 53.)

Keyser maintains she believed the time she recorded for working with the DVR

and/or utilizing its services was appropriately categorized as general time (*see* ECF No.

44 at 6 ¶¶ 50, 52) and further asserts that Skridulis "never asked [her] specifically what

she was doing with DVR or if she had performed any specific work-related activities at

that time" (*id.* at 46).  She also alleges the candidate Terracon hired to replace her after

her termination was not disabled and less qualified because she holds a B.S. in

Environmental Sustainability Studies (rather than engineering), her most recent job

experience prior to Terracon was as a barista at Starbucks, and she otherwise had no

---

[8] Indeed, Terracon disputes whether Keyser was working with the DVR at all during the week of
January 9, 2022.  (*See, e.g.,* ECF No. 57 at 8 ¶ 59.)  However, Keyser states she is not
"claim[ing] that she spent time with DVR 'during the time in question.'"  (ECF No. 44 at 6 ¶ 50.)
Instead, she asserts the time she recorded on her timesheet related to her use of DVR services
"typically" reflected time spent "'organizing and prioritizing work tasks and breaking down how to
get them completed more efficiently' with resources provided to her by DVR services," which
she believed would be considered general time as "tasks related to performing her job."  (*Id.*
(quoting ECF No. 44-3 (Keyser Dep.) at 61:23-25).)

prior relevant job experience.  (ECF No. 44 at 8 ¶ 62; *see also* ECF No. 44-16

(replacement's CV).)

## II.    LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the

movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Andersen v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the

relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.

Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the

nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and

all reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the

Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## III.    ANALYSIS

### A.    Discrimination

Keyser's ADA and CADA disability discrimination claims are analyzed under the

*McDonnell Douglas* burden-shifting framework.  *Davidson v. Am. Online, Inc.,* 337 F.3d

1179, 1189 (10th Cir. 2003) (citing *McDonnell Douglas v. Green,* 411 U.S. 792, 800–07

(1973)); *Colo. Civil Rights Comm'n v. Big O Tires, Inc.,* 940 P.2d 397, 399-400 (Colo.

1997) (adopting *McDonnell Douglas* in analyzing state employment discrimination claims under the CADA).

First, Keyser must establish a *prima facie* case by showing "(1) that [she] is disabled within the meaning of the ADA; (2) that [she] is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that [she] was discriminated against because of [her] disability." *Davidson,* 337 F.3d at 1188.  If Keyser establishes a *prima facie* case of discrimination, the burden then shifts to Terracon to articulate a "legitimate, nondiscriminatory reason" for Keyser's termination.  *Wells v. Colo. Dept. of Transp.,* 325 F.3d 1205, 1212 (10th Cir. 2003).  The burden then shifts back to Keyser, who carries the ultimate burden of persuasion, to demonstrate that Terracon's asserted reasons for her termination are pretextual.  *Id.*

For the purposes of this Order, the Court will assume that Keyser has satisfied her burden of establishing a *prima facie* case.  *Cf. Dewitt v. Sw. Bell Telephone Co.,* 845 F.3d 1299, 1308 (10th Cir. 2017) (adopting similar approach).  The burden thus shifts to Terracon "to articulate some legitimate, nondiscriminatory reason" for terminating Keyser.  *McDonnell Douglas,* 411 U.S. at 802.

1.    Legitimate, Nondiscriminatory Reason

Terracon's "burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000) (internal quotation marks omitted).  The burden to articulate a legitimate, nondiscriminatory reason for an adverse employment action has been characterized by the Tenth Circuit as "exceedingly light."  *E.E.O.C. v. C.R. England, Inc.,* 644 F.3d 1028, 1043 (10th Cir. 2011).

12

The Court has little trouble finding that Terracon has carried its burden here.

Terracon asserts it "terminated [Keyser] after two instances of timesheet fraud," each

being a violation of its Ethics Policy.  (ECF No. 43 at 20; *see also, e.g.,* ECF No. 43-9

(Skridulis Decl.) at ¶ 29 (stating he "decided to terminate Keyser's employment due her

[*sic*] dishonesty on her time entries on at least two occasions over the span of a few

months").)  This reason is on its face legitimate and non-discriminatory.  *C.R. England,*

644 F.3d at 1043.

    2.   <u>Pretext</u>

The burden then shifts back to Keyser to demonstrate "there is a genuine dispute

of material fact as to whether the employer's proffered reason for [her termination] is

pretextual—*i.e.,* unworthy of belief."  *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.

1997).  "The plaintiff may establish pretext by showing such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally

find them unworthy of credence and hence infer that the employer did not act for the

asserted non-discriminatory reasons."  *Bennett v. Windstream Commc'ns,* 792 F.3d

1261, 1267 (10th Cir. 2015) (citation omitted).

Still, "'[i]n determining whether the proffered reason for a decision was pretextual,

[courts] examine[] the facts as they appear *to the person making the decision*;' [courts]

do not look to the plaintiff's subjective evaluation of the situation."  *C.R. England,* 644

F.3d at 1044 (quoting *Zamora v. Elite Logistics, Inc.,* 478 F.3d 1160, 1166 (10th Cir.

2007)).  Thus, "[t]he relevant inquiry is not whether the defendant's proffered reasons

were wise, fair or correct, but whether [it] honestly believed those reasons and acted in

good faith upon those beliefs." *Rivera v. City & Cnty. of Denver,* 365 F.3d 912, 925 (10th Cir. 2004).

As a threshold issue, Keyser advances several arguments seeming to suggest Terracon fired her for reasons other than twice dishonestly reporting her time. For example, she argues there is no indication she was ever disciplined for failing to complete the VC report, that it is implausible she would have been disciplined only because the VC report took her more than 10 hours, and that it is implausible she would have been terminated for excessive general administrative time "because she had ten pay periods in six months where she reported five or more hours of general admin time, many weeks with little to no explanation of what she spent that time doing, and was never questioned about it before January 19, 2022." (ECF No. 44 at 16.)

Based on the facts presented, it appears fair to say that Skridulis's concerns about the quantity of time Keyser had charged in relation to work on the VC report and the general administrative code in January 2022, respectively, are what prompted him to confront her about how she was spending that time. However, Terracon's proffered reason for terminating Keyser is not that she spent *too much* time on the VC report or that she recorded *too much* time to the general administrative code. Rather, it is that Terracon believed she was dishonestly reporting how she was spending her time in those two instances. For that reason, the Court will limit its analysis to Keyser's arguments which bear some relevance to Terracon's proffered reason for firing her. In the Court's view, those arguments are three.

*First*, Keyser asserts "it is a genuine issue of material fact whether there was a first timecard fraud offense." (ECF No. 44 at 15.) She points to the absence of any

14

"record in [her] personnel file documenting any coaching regarding the 'VC' report," as well as the fact Skridulis referred her to human resources following the September 2021 Meeting.  (*Id.* at 15–16.)  She also notes that Terracon "states that it had a conversation telling Plaintiff about the importance of timesheet integrity," and without offering any evidence to affirmatively rebut such a conversation was had, appears to contrast that with her own recollection "that she told her supervisor the report was taking her longer to complete than usual because she was experiencing difficulty focusing and fatigue." (ECF No. 44 at 16 (citing ECF No. 44-20 at 40:11–25).)

This is insufficient evidence to raise a genuine issue of fact that Terracon's position as to the first alleged instance of timesheet fraud is unbelievable.  Specifically, the Court fails to see how Skridulis's referring Keyser to HR after she became emotional during the September 2021 Meeting, which is undisputed (ECF No. 44 at 3 ¶ 31), evidences the implausibility of his belief she had reported her time spent on the VC report dishonestly.  Moreover, while Keyser seems to suggest the two topics are mutually exclusive, it does not logically follow that, if Keyser told Skridulis "the report was taking her longer to complete than usual because she was experiencing difficulty focusing and fatigue" at the September 2021 Meeting, then Skridulis could not have also had a conversation with her about timesheet integrity.  And, while the Court can agree it is generally good practice to reduce to writing instances where employees are reprimanded or warned, the absence of such a formal record in Keyser's personnel file is alone insufficient to create a genuine issue of material fact, particularly in the absence of any evidence that Skridulis was required do so as a matter of company policy.

At bottom, what Keyser seems to argue is that *she* did not perceive the purpose

of the September 2021 Meeting as to discipline or reprimand her for dishonestly charging over 30 hours to VC for time spent working on a report.  However, Kaiser's "subjective evaluation" of the September 2021 Meeting is irrelevant.  *C.R. England,* 644 F.3d at 1044.  Thus, Keyser has failed to raise a genuine issue of fact that Terracon's position as to the first instance of alleged timesheet fraud is implausible.[9]

*Second*, Keyser argues Skridulis signed off on her timesheets from "ten [prior] pay periods during which [she] had more than 5 hours of general admin time per week just between August 1, 2022 and January 22, 2022," "many weeks with little to no explanation of what she spent that time doing," such that "it is implausible that this went unnoticed ten times and was a basis for termination."  (ECF No. 44 at 16-17.)  Even taking Keyser's characterization of her timesheets as true, the Court is unpersuaded that Skridulis's failure to question Keyser sooner about the time she was charging to the general administrative code is sufficient to create a genuine issue of material fact as to pretext.

*Third*, and finally, Keyser argues there is evidence of pretext because "she was just as, or more, qualified for a position than the individual chosen"—*i.e.,* her replacement, who was not disabled.  (*Id.* at 18.)  In support she cites a Tenth Circuit decision in which the ADA plaintiff was not selected from the applicant pool for a position to proceed to an interview.  *Harris v. Sweetwater Cnty. Sch. Dist. No. 2,* 113

---

[9] In the Court's view, it is most telling that Keyser has not argued she provided Skridulis with evidence of her progress on the VC report (*e.g.*, an incomplete draft, an outline, or even a detailed description of what she had accomplished) at the September 2021 Meeting, which might have otherwise showed Skridulis's belief she had dishonestly charged over 30 hours in relation to the VC report was an unreasonable one.

F.3d 1246, 1997 WL 92124, at *1 (10th Cir. June 3, 1997).  The Tenth Circuit noted he could potentially establish that the defendant's cited reason for not selecting him for an interview—namely, that he was less qualified—was pretextual "by showing that he was as qualified, or more qualified, than the six people chosen for the interview."  *Id.* at *2.

By contrast, evidence of Keyser's replacement being non-disabled and equally or less qualified than Keyser carries lesser probative value here, where Terracon's proffered reason for terminating Keyser was not that she proved to be unqualified for the position, but rather that she committed timesheet fraud in violation of its Ethics Policy.  Moreover, this is not a situation where Keyser was "passed over" for an opportunity in favor of a non-disabled candidate, as she was no longer part of the pool of eligible candidates for the position after being terminated, allegedly, for cause.  Thus, without more,[10] the Court finds this, too, is insufficient evidence to create a triable issue of fact as to whether Terracon's terminating Keyser for timesheet fraud was pretextual.

In sum, Keyser has failed to demonstrate a genuine issue of material fact that Terracon's proffered reason for terminating her was pretextual.  For the same reason, Terracon is entitled to summary judgment on Keyser's ADA and CADA discrimination claims.[11]

---

[10] For example, on the facts of this case, evidence that Keyser was disparately disciplined for the alleged instances of timesheet fraud as compared with a non-disabled, but otherwise similarly situated colleague at Terracon, might have been material evidence of pretext.  *See, e.g., Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1232 (10th Cir. 2000) ("a plaintiff may also show pretext on a theory of disparate treatment evidence by showing that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness").  Unfortunately for Plaintiff, no such evidence exists in the record.

[11] Terracon also raises a defense regarding after-acquired evidence in its Motion.  (ECF No. 43 at 22–24.)  Since the Court has concluded Keyser failed to raise a genuine issue of material fact as to pretext, it sees no need to address the merits of that defense.

**B.     Failure to Accommodate**

Terracon also seeks summary judgment on Keyser's failure to accommodate

claim on the basis that she failed to exhaust her administrative remedies prior to filing a

lawsuit.  (ECF No. 43 at 24.)  In her Complaint, Keyser alleged she requested two

reasonable accommodations: (1) "a temporarily reduced schedule to allow her to obtain

necessary treatment related to her disability," and (2) "prompt feedback from her

supervisor about her work performance so she could address any deficiencies that may

have been caused by the symptoms related to her disability."  (ECF No. 3 at ¶¶ 22–23.)

There is no dispute that Terracon granted the former request.  (ECF No. 43 at 10

¶ 36, undisputed at ECF No. 44 at 4 ¶ 36.)  However, in connection with her

discrimination claims arising under the ADA and CADA, Keyser alleged in her

Complaint that Terracon "failed to provide timely feedback to [her] including that it was

[Terracon's] position that time researching disability related resources to perform her job

duties was not time worked for purposes of her time tracking."  (ECF No. 3 at ¶¶ 59, 75.)

Moreover, in her brief in opposition to the Motion, Keyser argued for the first time that

Terracon also failed to accommodate her because "in disclosing that she was using

resources from DVR during work time, [she] was seeking accommodations."  (ECF No.

44 at 21.)  The Court separately addresses these asserted bases for her failure to

accommodate claim below.

1.     Request for "Prompt Feedback"

"In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional

prerequisite to filing an ADA action."  *Lara v. Unified Sch. Dist. #501,* 350 F. App'x 280,

285 (10th Cir. 2009).  Thus, "[a] plaintiff's ADA claim in federal court is limited by the

18

scope of the administrative investigation that can reasonably be expected to follow from the allegations of an administrative charge." *Id.* Courts "liberally construe the allegations in the EEOC charge, which 'must contain facts concerning the discriminatory and retaliatory actions underlying each claim.'" *Clark v. 10 Roads Express, LLC,* 2023 WL 6997397, at *1 (10th Cir. Oct. 24, 2023). This follows from the rule that "[i]t is well established that each discrete discriminatory action constitutes its own unlawful practice for which administrative remedies must be exhausted." *Martinez v. Target Corp.,* 384 F. App'x 840, 846 (10th Cir. 2010) (citation omitted); *see also Berry v. Cherwell Software, Ltd. Liab. Co.,* 2018 WL 4006302 (D. Colo. Aug. 22, 2018) (dismissing failure to accommodate claim because it was not asserted in charge filed with the EEOC).

Terracon argues that Keyser's Charge of Discrimination ("Charge") filed with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC") did not allege that Terracon failed to accommodate her disability in *any* respect. (*See generally* ECF No. 43-13.) Rather, the Charge asserted discrimination based on disability and retaliation. (*Id.* at 1.) Thus, her claim that Keyser failed to accommodate her request for "prompt feedback" appeared for the first time in her Complaint.

Even setting aside that Keyser did not "check the box," so to speak, for a failure-to-accommodate claim in the Charge, the Court agrees that the Charge is devoid of any facts related to her alleged request for "prompt feedback so that she could address any deficiencies allegedly caused by her disability." The Court thus readily finds that Keyser failed to exhaust her administrative remedies as it relates to any claim based on Terracon's alleged failure to accommodate her request for "prompt feedback."

19

2.    <u>Use of DVR Resources</u>

Notably, Keyser does not counterargue in her response brief that the Charge

adequately set forth facts pertaining to her request for a reasonable accommodation of

"prompt feedback."  (*See generally* ECF No. 43 at 21.)  Instead, Keyser's opposition

rests entirely on a new theory for her failure to accommodate claim: that by "disclosing

that she was using resources from DVR during work time," Keyser was seeking

reasonable accommodations, and she was instead terminated.  (*Id.*)

Terracon argues that Keyser failed to exhaust her administrative remedies as to

this theory, too, because she did not state anywhere in the Charge that she requested

an accommodation to use company general administrative time for "using resources

from DVR during work time."[12]  Keyser asserts, however, she alleged the predicate facts

in the Charge by stating: "I had been using my downtime to work with external

resources to get support for my disability accommodations and to get the tools I needed

to complete my tasks."  (ECF No. 43-13 at 2; *see also id.* ("I was told that I could not

use my downtime to work on my disability resources and that I cannot get paid for that

time as it is not time worked.").)  The Court will assume this is sufficient to exhaust her

administrative remedies for this claim.

Terracon additionally and alternatively argues that Keyser's claim fails because

---

[12] For the purposes of this Order, the Court will set aside that Keyser does not appear to have
even alleged a failure-to-accommodate claim in her Complaint based on her "disclosing that she
was using resources from DVR during work time," which might otherwise beg the question
whether the Court should construe her argument as a request to amend her Complaint.  *See
Martinez v. Potter,* 347 F.3d 1208, 1211 (10th Cir. 2003) ("[O]ur cases interpret the inclusion of
new allegations in a response to a motion for summary judgment, as a potential request to
amend the complaint.").  Since the Court ultimately concludes the claim is non-meritorious in
any case, it does not reach this question.

20

the alleged "request i[s] unreasonable and would not have impacted [Terracon]'s decision to terminate her because the misconduct identified, misuse of the general administrative code, existed before the alleged request."  (ECF No. 57 at 13.)  To establish a *prima facie* failure-to-accommodate claim, Keyser must establish (1) she was disabled, (2) she was otherwise qualified, (3) she requested a plausibly reasonable accommodation, and (4) the defendant refused to accommodate her disability.  *Aubrey v. Koppes,* 975 F.3d 995, 1005 (10th Cir. 2020).  The Court agrees with Terracon that Keyser's claim fails at the third prong.

To facilitate reasonable accommodations, "[t]he federal regulations implementing the ADA envision an interactive process that requires participation by both parties." *Bartee v. Michelin N. Am., Inc.,* 374 F.3d 906, 916 (10th Cir. 2004) (alteration in original) (citation omitted).  "However, before an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice."  *C.R. Eng.,* 644 F.3d at 1049; *see also Aubrey,* 975 F.3d at 1006 ("An employer cannot be liable for failing to accommodate a disability if it is unaware of the need for an accommodation.").  To be sure, the notice or request does not need to "formally invoke the magic words 'reasonable accommodation,'" but it "nonetheless must make clear that the employee wants assistance for his or her disability."  *C.R. Eng.,* 644 F.3d at 1049 (citation omitted).

Here, the only evidence of Keyser's "request" for an accommodation related to DVR services is, in response to Skridulis's e-mail asking for an explanation regarding the 10.50 hours of general administrative time she had *already* charged, the statement

21

in her e-mail:

> I should have talked to you about this, but it feels kind of
> embarrassing . . . .  I've been working with the [DVR] to try to
> come up with ways to manage the ways my disability can
> make my work performance and consistency hard to keep
> up with.

(ECF No. 43-11 at 1.)  The Court finds the Tenth Circuit's discussion in *Dewitt v.
Southwestern Bell Telephone Company* instructive here.  845 F.3d 1299, 1316 (10th
Cir. 2017).

In that case, the ADA plaintiff, who had Type I diabetes, was terminated after
hanging up on two customers, which was a violation of the employer's Code of
Business Conduct and a "Last Chance Agreement" to which the plaintiff was subject
due to prior performance issues.  *Id.* at 1305-06.  At a pre-termination meeting, the
plaintiff "explained that she did not remember taking the calls due to a severe drop in
her blood sugar."  *Id.* at 1305.  The Tenth Circuit affirmed summary judgment in favor of
the employer on her ADAAA accommodation claim "because she did not request a
reasonable accommodation to address concerns regarding the possibility of dropped
calls; instead, she requested retroactive leniency for her misconduct."  *Id.* at 1316.  Put
differently, she requested that her employer "overlook that she hung upon at least two
customers while on a Last Chance Agreement."  *Id.*

The Tenth Circuit reasoned that "[t]he ADAAA does not require employers to
reasonably accommodate an employee's disability by overlooking past misconduct—
irrespective of whether the misconduct resulted from the employee's disability."  *Id.*  It
noted that the EEOC's Enforcement Guidance "makes clear that the requirement to
provide reasonable accommodation under the ADAAA is 'always prospective,' and that

an 'employer is not required to excuse past misconduct even if it is the result of the

individual's disability."  *Id.* (citing U.S. Equal Employment Opportunity Comm'n,

Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the

Americans with Disabilities Act Nos. 36, 35 ("An employer never has to excuse a

violation of a uniformly applied conduct rule that is job-related and consistent with

business necessity.")); *see also Davila v. Quest Corp., Inc.,* 113 F. App'x 849, 854 (10th

Cir. 2004) (emphasis added) (explaining that "excusing workplace misconduct to

provide a fresh start/second chance to an employee whose disability could be offered

as an *after-the-fact excuse* is not a required accommodation under the ADA").

As the Court has already concluded, Keyser failed to raise a genuine dispute of

fact that Terracon's position that her charging of time spent "working with the [DVR]" to

the company general administrative code was a violation of the Ethics Policy is

unworthy of belief.  The Court similarly concludes that Terracon was not required to

overlook her violation of the Ethics Policy, even to the extent Keyser did spend the time

Terracon believes was dishonestly charged seeking out resources related to her

disability.  It is regrettable that Keyser did not proactively request, for example, a

reasonable accommodation of approval to charge a certain amount of time to the

company's general administrative code for time spent making use of the DVR's

resources or services.  Had she done so, the Court may have concluded differently.

However, there is no material dispute that Keyser did not seek such approval.  (ECF

No. 43 at 13 ¶ 50; ECF No. 44 at 6 ¶ 50.)  And Terracon cannot be held liable for failing

to accommodate a request that was never made.

Nonetheless, Keyser argues that Terracon "had an obligation under *Den Hartog*

23

to consider whether the misconduct of an employee with a mental disability can be
remedied through a reasonable accommodation."  (ECF No. 44 at 21.)  In that case, the
Tenth Circuit analyzed whether a "bright line" should be recognized between
discrimination based on a disability and discrimination based on *misconduct* by the
disabled person.  *Den Hartog v. Wasatch Academy,* 129 F.3d 1076, 1085–86 (10th Cir.
1997).  It reasoned that the provisions of the ADA setting forth certain affirmative
defenses for employers—for example, that an employer is not required to make any
accommodation that could constitute an "undue hardship," and may take action against
an employee who poses a "direct threat" to the health and safety of other individuals in
the workplace—demonstrate "there are certain levels of disability-caused conduct that
need not be tolerated or accommodated by employers."  *Id.* at 1087 (citations omitted).
"However, the necessary corollary is that there [are] certain levels of disability-caused
conduct that have to be tolerated or accommodated."  *Id.*

Specifically in the context of mental illness-related disabilities, the Tenth Circuit
reasoned "[t]o permit employers carte blanche to terminate employees with mental
disabilities on the basis of any abnormal behavior would largely nullify the ADA's
protection of the mentally disabled," given "[m]ental illness is manifested [and normally
diagnosed] by abnormal behavior."  *Id.*  Thus, the Tenth Circuit concluded that "an
employer should normally consider whether a mentally disabled employee's purported
misconduct could be remedied through a reasonable accommodation."  *Id.* at 1088.  If
not, the employer must generally "tolerate eccentric or unusual conduct *caused by the*
*employee's mental disability*, so long as the employee can satisfactorily perform the
essential functions of his job."  *Id.* at 1088 (emphasis added).

24

Here, the Court is persuaded by Terracon's argument that *Den Hartog* is inapplicable. As already discussed at length, Keyser has failed to raise a genuine issue of fact that Terracon's proffered reason for terminating her—that it believed she lied on her timesheets on two occasions—was pretextual. Keyser has never claimed or provided any evidence that dishonestly reporting her time on her timesheets in violation of the Ethics Policy was because of her disability.[13]

In sum, regardless of whether Keyser's failure to accommodate claim is based on Terracon's alleged failure to provide prompt feedback or failure to permit her to use work time to use DVR resources, her claim fails. Accordingly, Terracon is entitled to summary judgment on her failure-to-accommodate claim under the ADA and CADA.

## C.    Retaliation

Finally, Terracon seeks summary judgment on Keyser's retaliation claim. Keyser relies on the *McDonnell Douglas* framework in her brief, so the Court will adopt the same approach. (ECF No. 44 at 19); *see also Lincoln v. BNSF Railway Co.,* 900 F.3d 1166, 1209 (10th Cir. 2018) ("Where a plaintiff relies on circumstantial evidence to establish [their] claim, the *McDonnell Douglas* burden-shifting framework applies.") Thus, Keyser must first demonstrate a *prima facie* case of retaliation by demonstrating

---

[13] To the extent Keyser also argues that, because of her disability, Terracon had a duty to proactively offer her a reasonable accommodation even if she did not request it, this argument, too, runs contrary to law. *See Dinse v. Carlisle Foodserv. Prods. Inc.,* 541 F. App'x 885, 890 (10th Cir. 2013) ("Certainly, an employer may inquire whether an employee needs an accommodation before an employee has made an adequate request, but an employer is under no legal obligation to do so absent such an employee request."); *Koessel v. Sublette Cnty. Sheriff's Dep't,* 717 F.3d 736, 744 (10th Cir. 2013) ("It is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests.").

that (1) she engaged in a protected activity, (2) she was subject to an adverse
employment action subsequent to or contemporaneous with the protected activity, and
(3) there was a causal connection between the protected activity and the adverse
employment action. *Lincoln,* 900 F.3d at 1209; *see also Anderson v. Coors Brewing
Co.,* 181 F.3d 1171, 1178 (10th Cir. 1999).

In her Complaint, Keyser alleged that, "[a]fter [she] returned from her disability
related temporarily reduced schedule leave," Terracon retaliated against her by:
(1) "failing to assign her adequate work to constitute full time hours," (2) "disciplining her
for failing to meet chargeability requirements, despite numerous attempts by [Keyser] to
obtain additional work," and (3) "failing to give her timely feedback about any concerns
they allegedly had had regarding her accounting of her time worked, and subsequently
terminating her for alleged 'timecard fraud.'" (ECF No. 3 at ¶¶ 65–67, 81–83.)

Terracon appears to concede that Keyser's request for an accommodation of a
reduced schedule qualifies as a "protected activity." *See also Lincoln,* 900 F.3d at
1209. Moreover, Terracon acknowledges Keyser's termination would qualify as an
"adverse employment action." *C.R. Eng.,* 644 F.3d at 1040 (recognizing "firing" as an
adverse employment action). However, it argues there is no causal connection
between her request for a reduced schedule and her termination.

To prove a causal connection, the plaintiff must "present evidence of
circumstances that justify an inference of retaliatory motive." *Ward v. Jewell,* 722 F.3d
1199, 1203 (10th Cir. 2014); *see also Bekkem v. Wilkie,* 915 F.3d 1258, 1273 (10th Cir.
2019) (plaintiff must show that "the desire to retaliate was the but-for cause of the
challenged employment action"). "A causal connection may be inferred if the protected

26

conduct is closely followed by the adverse action."  *Wolff v. United Airlines,* 2020 WL

1138517, at *17 (D. Colo. Mar. 9, 2020) (citing *Wilkie,* 915 F.3d at 1271).  "A gap of

three months or more, standing alone, is too long to support an inference of causation

on its own" and "a plaintiff must present other evidence to establish causation."  *Id.*

        Here, there is a gap of over three months between Keyser's initial request for a

reduced schedule, which occurred on September 30, 2021, and her termination, which

occurred on January 24, 2022.  (ECF No. 43-10; ECF No. 43 at 13 ¶ 53, undisputed as

to date of Keyser's termination at ECF No. 44 at 6 ¶ 53.)  Keyser has not offered any

counterargument or evidence to support that a causal connection between her request

for a reduced schedule and her termination nonetheless exists.  (*See generally* ECF No.

44 at 19-20.)

        With respect to the other adverse employment actions Keyser alleged in her

Complaint, Terracon argues that "not providing 'feedback' to [Keyser] or not assigning

her enough work as she alleges are not significant changes in [her] employment status

or benefits, and therefore are not adverse actions."  (ECF No. 43 at 26.)  Keyser has not

counterargued this point either.  (*See generally* ECF No. 44 at 19-20.)

        Instead, Keyser again wholly abandons the theories asserted in her Complaint,

and now argues only that her "disclos[ure] that she was engaging the services of DVR

to assist her with her disability to help her at work" "constitute[s] a protected activity in

the form of a request for accommodation."  (ECF No. 44 at 19.)  The Court has already

concluded that Keyser's "disclos[ure] that she was engaging the services of DVR" was

not a request for an accommodation of her disability.  For the same reason, it cannot

form the basis for her retaliation claim.

Thus, Terracon is also entitled to summary judgment on Keyser's retaliation claims asserted under the ADA and CADA.

## IV.     CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     The Motion is GRANTED;

2.     The action is DISMISSED WITH PREJUDICE;

3.     Judgment shall enter in favor of Defendant and against Plaintiff on her CADA claims (First & Second Claims) and ADA claims (Third & Fourth Claims); and

4.     As the prevailing party, Terracon is entitled to its costs related to Keyser's claims arising under the CADA and ADA pursuant to Fed. R. Civ. P. 54(d)(1).

Dated this 18th day of November, 2024.

BY THE COURT:

William J. Martínez
Senior United States District Judge